Filed 12/15/22  P. v. Herbert CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSHUA RYAN HERBERT,<br><br>    Defendant and Appellant. | D078399<br><br><br>(Super. Ct. No. RIF1702155) |


APPEAL from a judgment of the Superior Court of Riverside County, Charles J. Koosed, Judge.  Affirmed in part, and reversed and remanded in part.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Paige B. Hazard, and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

Joshua Herbert, a member of the Mongols motorcycle gang, opened fire at several rival Hells Angels gang members, who were unarmed, at a gas station in Riverside. One of the Hells Angels members was killed. Herbert was arrested and charged with first degree murder, with a gang special circumstance allegation, and attempted murder. The jury found Herbert guilty of both charges, and found true the special circumstance allegation under Penal Code section 190.2, subdivision (a)(22)[1] and allegations under section 186.22, subdivision (b)(1) that he committed the offenses as an active participate in a criminal street gang.

On appeal from the convictions, Herbert argues that insufficient evidence supported the jury's findings that (1) he was an active participant in the Mongols at the time of the shootings and (2) the crime was committed to further the activities of the gang. Herbert also contends that the jury's special circumstance and gang enhancement findings must be reversed in light of recent changes to section 186.22 made by Assembly Bill No. 333 (2021–2022 Reg. Sess.). Herbert argues the changes are retroactive to his case, and that under the new law there is insufficient evidence in the record to show the predicate offenses were committed by gang members collectively and that the benefit to the gang was more than reputational. Herbert also argues that new section 1109, created by Assembly Bill 333, applies retroactively to his case and requires reversal so that the gang evidence can be bifurcated in a new trial.

The Attorney General concedes that the changes made by Assembly Bill 333 to section 186.22 are retroactive. However, he asserts those changes do not apply to the special circumstance provision, section 190.2, subdivision (a)(22), because they unconstitutionally override the law, which

---

[1]     Subsequent undesignated statutory references are to the Penal Code.

2

was enacted by ballot measure. Alternatively, the Attorney General argues that even if the new law applies, remand is unnecessary because Herbert cannot show prejudicial error.

We agree with the People that sufficient evidence supported the jury's findings that Herbert was an active gang member at the time of the shootings and that he committed the crimes to further the activities of the gang. However, we reject the Attorney General's arguments that Assembly Bill 333 does not affect section 190.2, subdivision (a)(22) and that any error based on the new law was not prejudicial. Because we conclude the changes to section 186.22 apply retroactively, both the special circumstance finding and the enhancement findings are vacated. On remand, the People may retry Herbert on those allegations, incorporating the statutory definitions in section 186.22, as amended by Assembly Bill 333. We reject Herbert's contention that the case must be remanded to allow bifurcation of the gang evidence because we conclude the asserted error under new section 1109 is not prejudicial in this case.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Prosecution's Case*

1. *Background, Shooting, and Initial Confession*

Herbert, who had worked as an electrician and as a bouncer at a nightclub, joined the Mongols Motorcycle Club (Mongols) in 2014. According to Herbert's former girlfriend and the mother of his child, M.S., when Herbert became a "prospect" of the Mongols he prioritized the gang over everything else in his life. Herbert had many tattoos identifying him as a Mongol.

On May 21, 2017, around 10:00 p.m., five male motorcyclists wearing vests and helmets with Hells Angels insignia stopped for gas at a Shell station on Adams Street in Riverside. The bikers went into the gas station's

3

market and pumped gas, joking and talking throughout. While the bikers were there, the cashier on duty, B.S., saw a silver or gray sedan drive through the station. She noticed that the front fender on the passenger side was damaged near the wheel. B.S. did not see the sedan's license plates, and neither the station's surveillance video camera nor any other security camera in the area captured them.

While the bikers were still at the gas station, a second cashier, C.P., arrived for her shift. Shortly after, the same vehicle that had driven through the station returned. The station's video camera showed the bottom of the car and, as the car rolled forward, the front passenger door opened and then closed. Around this time, B.S. heard several gunshots. She looked out the store's windows and saw one of the bikers running and another lying on the ground. B.S. saw asphalt fly into the air near one of the gas pumps. She also saw the top of the gray car driving away from the station.

When C.P. heard the shots from the store's backroom, she ran out of the store, yelling to B.S. to call 9-1-1. C.P. saw a gray car driving out of the gas station. C.P. thought the car was a Toyota, and one of the bikers was "yelling it was the Toyota." C.P. told officers after the incident that the car had damage on the front near the wheel, and that the car looked sporty. She saw two occupants, the driver and the passenger that she believed was the shooter.

C.P. ran to the biker lying on the ground near one of the gas pumps and got down on the ground with him. Another one of the men told her the victim had been shot, and C.P. saw blood around his head. C.P. held the man's hand and noticed his breathing was short and encouraged him to keep his eyes open. Shortly after, the police and an ambulance arrived. C.P. told one of the

4

police officers that she saw the passenger in the gray car, and that he did not have facial hair or tattoos, and looked between 17 and 22 years old.

Once at the scene, police discovered evidence that at least four shots were fired:  (1) two projectiles found in the victim, James Duty, who had died by the time first responders arrived at the gas station, (2) a medium-sized projectile on a motorcycle seat, and (3) a helmet grazed by a bullet that belonged to another one of the bikers.  No expended bullet casings were found on the scene, suggesting the shooter had used a revolver.  None of the Hells Angels that remained at the scene when the police arrived were found to be or seen carrying any firearms.  A bullet pierced the side of Duty's leather vest, which featured Hells Angels insignia and a patch that read "Prospect So Cal," indicating he was in the process of becoming a member of the Hells Angels.  Duty also had Hells Angels-related tattoos.

Within two days of the shooting, Herbert contacted M.S.  At that time, M.S. had a restraining order protecting her and their seven-year-old child from Herbert.  M.S. and the child were living at a domestic violence shelter. Herbert called M.S. in the evening, after dark, and asked her to meet him at a restaurant near the shelter.  M.S. agreed, and Herbert arrived at the restaurant parking lot in his gray Nissan Versa, which Herbert had originally purchased for M.S. in 2015 or 2016.  M.S. had several accidents in the car.  Among other damage, the Nissan's front bumper was attached by zip ties and the car had no hubcaps.  In 2016, M.S. stopped driving the car and returned it to Herbert.

Herbert parked next to M.S. at the restaurant, and got into M.S.'s car, where their child was asleep in the backseat.  M.S. testified that Herbert looked "defeated."  He was initially quiet, then started crying hard.  He told M.S. he "fucked up" and "did something really bad."  He then confessed to

5

killing two Hells Angels at a gas station, telling M.S. he "smoked them" and that he was planning to leave for Mexico. Herbert asked M.S. to come to Mexico with him and bring their child. M.S. told Herbert he was on his own, and that he would not get away with the killing. Herbert then got back in his car and drove away.

The next day, M.S. met Herbert again, this time at a Wal-Mart so that Herbert could buy things for their child. Once there, Herbert threatened M.S. that if she told anyone what he had confessed he would kill her and their child. He flashed a gun in the waistband of his pants at M.S. inside the Wal-Mart. The encounter ended, and M.S. returned to the shelter.

Distraught, the next day, M.S. went to her mother and step-father's house for advice. M.S. told her mother that Herbert had confessed to the killing and that she did not know what she should do. Her mother, S.L., and her stepfather told her to call the police. M.S. was scared to call the police because she feared that Herbert, or other Mongols, might retaliate against her and their child. While M.S. was with her parents, her child saw a news report that included a picture of the car used in the shooting. M.S. and her child both recognized the car as the Nissan Versa. Eventually, with encouragement from S.L. and her stepfather, on May 23, 2017, M.S. called the police to leave an anonymous tip that Herbert was the shooter.

2. *Police Investigation*

To obscure her own number, M.S. used S.L.'s phone to make the call to a crime tip line. She gave Herbert's name, date of birth, height, weight, hair and eye color, and a description of the Nissan. A dispatcher at the crime tip line was able to provide investigators with S.L.'s phone number and Riverside Police Department Detective James Simons contacted S.L. S.L. gave Simons M.S.'s phone number, and he contacted her. They spoke for a

6

half hour, and M.S. confirmed the information she had provided to the tip line and also gave Simons additional details about the crime and the circumstances of Herbert's confession and threats to her.

M.S. met with Simons several times.[2]  In those meetings, she identified the car—which was missing hubcaps and had distinctive damage on it—from still photographs from the gas station surveillance as Herbert's Nissan.  M.S. told Simons that Herbert's relationship with the Mongols was strained and that he wanted "to kill the Hells Angels" to make amends and get his motorcycle back from the Mongols.  M.S. testified that before the shooting, Herbert told her "he was having problems" with the Mongols, that he had been kicked out, and that the Mongols had taken his motorcycle.  She stated that several months prior to the shooting, Herbert attempted to earn his bike back by putting "a Hells Angel at gunpoint and took cuts and brought it back to where the Mongols were."[3]  M.S. said this effort was not sufficient, and Herbert said he was still "not good" with the Mongols.

Sometime after the shooting, Herbert went to the electrician's union hall where S.L. worked as the union dues collector.  When he saw S.L., he lifted his shirt up, flashed a beige and cream gun, and said, "Did you see the news?"  Herbert also made a shooting gesture with his hands.  During the same conversation, he asked S.L. "who he needed to kill to get his paycheck."

Once he had Herbert's name and birthdate, Simons ran the information through police databases to research his criminal history, location, and

---

[2]    Simons also helped relocate M.S. and her child to a new apartment to protect her from retribution from Herbert and the Mongols.

[3]    Cuts are the leather vests worn by motorcycle club members that bear the club's insignia and identify them as members or prospective members of the club.

7

driver's license. Simons retrieved a citation that contained a license plate number linked to a 2004 Nissan Versa registered to Herbert. Simons then ran the license plate through Vigilant Video Systems, a plate-scanning system that captures photographs of plates. The license plate scan photos showed Herbert was driving the Nissan during the prior 18 months without rims or hubcaps on the wheels, just as the car appeared in the Shell gas station surveillance video. Simons also found Herbert's Facebook page, which contained photographs of him wearing Mongols gang attire and posing with other club members.

Simons prepared and obtained a search warrant for Herbert's cell phone and car. In addition, he obtained a wiretap intercept to listen to Herbert's multiple cell phones and the phones of other Mongol members he associated with around the time of the shootings, specifically those he was in contact with just before and after. The investigators found Herbert was in "contact with Mongols during the time period of [the] investigation between the date of the shooting and the date he was arrested." Notably, he called three known Mongols—M.G., K.R., and J.D.—on the night of the shootings.

Using Herbert's completed inbound and outbound calls on the night of the shootings, detectives produced a timeline of approximate locations of his phone and tracked its eastward movement from Anaheim to Riverside. At 10:05 p.m., within 30 minutes of the shooting, Herbert's phone pinged a Riverside cell tower 1.5 miles from the Shell gas station. Cell tower records showed the phone heading back towards Anaheim at 10:35 p.m.

The wiretaps also showed that M.S. sent a text message to Herbert on June 9 that read, "[our child] saw the fucking news and ran to me and asked me how can you do that? ... And how is he going to see you after the cops

8

take you to jail?" Herbert responded, "If anybody is listening, [M.S.] is an accessory."

The wiretaps also led to another witness who identified the Nissan Versa as Herbert's car. M.S. told Simons that she and Herbert had once shared an apartment in Garden Grove with M.K., a member of the Mongols known by the nickname "Gator." When officers went to interview M.K. at his home, M.K.'s girlfriend T.J. answered the door. T.J. was shown a picture of the vehicle but did not give the investigator any information about Herbert. When the officer left the house, however, the wiretaps showed that immediately after, T.J. called M.K. and told him the police "just showed me a picture of [Herbert's] car."

On June 21, 2017, police arrested Herbert at his home and conducted an extensive search. While inside the house, Herbert pointed Simons to a fully loaded .357 Magnum revolver and .38 special caliber ammunition lodged between his nightstand and bed. Police also found other "portions of firearms," a bulletproof vest, and additional ammunition—both 9 mm and .38 special cartridges—inside Herbert's bedroom closet.

Police also uncovered significant amounts of Mongol paraphernalia. Herbert had numerous shirts bearing the words Mongols and other common Mongol slogans and symbols such as "Respect Few, Fear None," lightning bolts, and an illustration of Genghis Khan, which served as a logo for the gang. Herbert had a patch that said "RFKNSIDE," a slang term for Riverside, which represented the Inland Empire and Orange County area that his chapter of the Mongols claimed as territory. A shelf in Herbert's bedroom displayed a motorcycle helmet with the words "Fuck Hells Angels" on it.

Police also found a "high visibility" neon yellow shirt, which appeared to be similar to the shirt worn by the shooter in the surveillance video from the Shell station. Outside Herbert's home, investigators found and photographed the Nissan Versa. Inside the car was an empty black gun case, six .38 special caliber bullets, and a neon yellow high visibility vest.

On the day of Herbert's arrest, dozens of officers from both state and federal agencies also conducted searches of seven other Mongols' homes. During those searches, authorities found similar Mongol paraphernalia, including Mongol tattoos, motorcycles, art, stickers, clothing, and writings, as well as membership rosters. One of the homes where Mongols paraphernalia was found belonged to M.G., who had been in contact with Herbert the night of the shooting, and was located just two blocks north of the Shell station.

A firearms expert compared the revolver found at Herbert's home with the bullets recovered from Duty's body and the Shell station. The expert was unable to offer a conclusive opinion as to whether the bullets were fired from Herbert's gun, but testified it was possible.

Interviews with the bikers at the gas station shooting proved mostly unhelpful. Only one biker interviewed by police gave information, though his account was generally consistent with the surveillance video from the gas station.

After his arrest, Herbert was interviewed by Simons and another Riverside Police Department detective. The video-recorded interview was played for the jury. Herbert admitted he had been a member of the Mongols for three years. He told the detectives that he had been kicked out of the club, which he called "out bad," two or three months before and that they had taken his motorcycle. Herbert explained that he had slept with another Mongol member's ex-wife, which led to the expulsion. He also told the

detectives that he had seen the shooting on the news, and the car looked like his, but his car had chrome rims, not black ones like the car involved in the murder.

Herbert denied being in Riverside on May 21, 2017. He told the detectives that he was working at a nightclub in Anaheim that night and that he couldn't remember the last time he was in Riverside. When shown the still picture of the car from the gas station surveillance camera, Herbert denied the car was his. He denied that his car ever had black rims, or no rims at all, like the one in the still and in other photos of the Nissan Versa that had been captured by the plate-scanning system. When Simons suggested that Herbert had changed the rims to avoid detection, Herbert denied that was the reason and said he had recently added chrome rims so he could sell the car for more money.

Herbert also told the detectives he was not trying to rejoin the Mongols and that any Mongol who said he was the shooter was trying to pin the crime on him. When Simons told Herbert his cell phone records put him near the shooting, Herbert again denied involvement and repeated that he was working at the nightclub. He said he worked the nightclub, went home, then went to work on a union electrician job the next morning. Herbert did admit he knew M.G., who lived near the Shell gas station. At one point, Herbert asked the officers, "Why would I jump out of my own car and then still be carrying the same gun[?] That's fucking stupid." The detectives, however, had not suggested during the interview that the shooter had jumped out of the car, nor was there any public information suggesting that fact.

During his interview, Herbert stated that two coworkers could corroborate that he was at the nightclub the night of the shooting. Simons followed up with the coworkers, and they provided paperwork suggesting

11

Herbert left early and only worked "half a shift" from 6 p.m. to "either 9:30 or 10:30." Neither man had any further information as to what time Herbert stopped working, and both declined to name other employees who might have more information.

3. *Gang Expert*

The prosecution introduced the testimony of a gang expert, San Bernardino County Sheriff's Department Detective Josh Guerry. Guerry was an experienced gang unit detective and had received specialized training about gangs in Southern California. He also had experience investigating crimes of the Mongols specifically. He testified about the Mongols generally, including their territory and history, the process of becoming a member, the significance of the clothing and tattoos of the gang's members and prospects, and the process and ramifications of being kicked out of the Mongols. Guerry testified that if a member is kicked out of the club, as Herbert claimed, one way to rejoin would be to kill a rival Hells Angels member.

Guerry also testified about three prior crimes that were committed by other members of the Mongols, which served as the predicate offenses for the gang enhancement and special circumstance murder allegations charged against Herbert. The first predicate offense involved two Mongols members, Mitchell Reyes and Thomas Zon, who were charged with and pleaded guilty to carjacking (§ 215, subd. (a)), street terrorism (§ 186.22, subd. (a)), evading a police officer (Veh. Code, § 2800.2, subd. (a)), and gang enhancement allegations under section 186.22, subdivision (b)(1)(C). Guerry testified that on January 6, 2017, both men were members of the Mongols, they committed the crimes together, and the crimes were committed for the benefit of that gang. Guerry provided no details on the crime or how it benefitted the gang,

12

except to state that one of the men pointed a gun at the employee of a motorcycle store, and that "a vehicle was taken from the business."

The second predicate offense involved Roy Carlos. On August 21, 2014, Police responded to an assault and found a man severely beaten. According to Guerry, witnesses reported that Carlos was a Mongols prospect and that he attacked the victim, who was playing basketball in the street with his son. Witnesses told police that Carlos also said you are in "Mongols country and you don't mess with the Mongols." During his investigation of the crime, Guerry found Mongols paraphernalia at Carlos's home. Carlos pleaded guilty to assault likely to produce great bodily injury (§ 245, subd. (a)(4)) and admitted a gang enhancement under section 186.22, subdivision (b)(1)(B). Guerry did not testify about how this crime benefitted the Mongols.

Guerry testified that the third predicate offense was the July 6, 2013 guilty plea of Mongols member Paul Rios. Rios pleaded guilty to carrying a loaded firearm in a vehicle (§ 25850) and a gang enhancement under section 186.22, subdivision (b)(1)(B). Guerry provided no further testimony about the crime, though the jury was shown a picture of Rios with tattoos that Guerry described as being earned for a "violent altercation" such as "assault, shooting, [and] stabbing."

Guerry also explained the long-standing rivalry between the Mongols and the Hells Angels, which originated in 1969 when the Mongols claimed California to be their territory. The conflict included armed clashes and many murders on both sides. Guerry also explained the significance of the gangs' insignia, on clothing, tattoos, and other paraphernalia, as it relates to both the conflict between and membership in the two motorcycle clubs.

With respect to Herbert, Guerry testified about the significance of his tattoos, confirming that they established his membership in the Mongols.

13

When asked hypothetically what the ramifications would be for a gang if a Mongols member, even if he had been kicked out of the club, had killed a rival Hells Angel member, Guerry responded that the killing would boost the member's reputation and the reputation of the Mongols because it would be seen as a "more violent gang."

B. *The Defense Case*

Herbert testified in his own defense. He denied he was the shooter, and denied ever telling M.S. or anyone else he had committed the crimes. Herbert claimed he was working at the nightclub in Anaheim the night of the shooting. Herbert refused to answer most of the questions posed to him about the trial evidence, telling the jury he feared retaliation by the Mongols and that he did not want to be "a snitch."

Some of Herbert's testimony on cross-examination corroborated the prosecution's evidence and theory of the case. The prosecution asked Herbert about recorded jailhouse calls with fellow Mongol D.M. On these calls, appellant asked D.M. to "send[] him clippings of news articles about [him]" and to "save them for [him] and laminate them" because "it's just a big deal." He acknowledged that he was well-known in jail because he was accused of killing a Hells Angel. Herbert admitted it was possible the car involved in the shooting was his and acknowledged that he changed his cell phone number just days after the shooting. He also acknowledged he changed the appearance of his car days after the shooting by adding chrome hubcaps, tinting the windows, and adding a "Life's a Beach" sticker to the rear window.

Herbert admitted he had been a member of the Mongols Commerce Chapter, but told the jury that when his motorcycle was in the shop, he was kicked out of the gang and his motorcycle was taken. He refused to disclose

14

what shop the motorcycle had been in.  Although he said he was no longer a Mongols member and he did not speak with anyone who was, he admitted he was in contact with Mongol members including M.G., J.D., K.R., and D.M.

When asked to explain the fact that he still had a large quantity of Mongols paraphernalia at his home, Herbert said, "Because I paid for it and I wasn't going to give it to them."  When he was asked if he hated the Hells Angels, Herbert would only state that he "didn't care."  When asked about his text message to M.S. which stated, "If anybody is listening, [M.S.] is an accessory," Herbert admitted he sent the text, but denied that it was a threat or that it showed his own involvement in the crime.  Rather, Herbert told the jury he was "just joking."

C. *Jury Verdict and Sentencing*

After the trial concluded, the jury returned its verdict finding Herbert guilty of murder (count 1) and attempted murder (count 2).  In addition, the jury found true the gang-murder special circumstance allegation under section 190.2, subdivision (a)(22) and, as to both convictions, found true the allegation that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of section 186.22.  Finally, the jury found Herbert personally used a firearm to commit both offenses in violation of section 12022.53, subdivisions (c) and (d).

On August 28, 2020, the trial court sentenced Herbert to life without the possibility of parole on count 1.  As to that count, the court also imposed and stayed a ten-year term on the gang enhancement and imposed a concurrent 25-year-to-life term on the gun use enhancement.  As to count 2, the court imposed a concurrent 15-year-to-life term and imposed and stayed both the 10-year gang enhancement term and the 20-year gun use enhancement term.  Herbert timely appealed.

DISCUSSION

On appeal, Herbert challenges the jury's findings on the gang enhancements and special circumstance murder allegations. He contends that insufficient evidence supported certain elements of the true findings on these allegations, and also that Assembly Bill 333's changes to the scope of the gang statutes apply retroactively to his convictions, requiring reversal. Herbert also argues new section 1109 applies retroactively, requiring reversal of his murder and attempted murder convictions so that the gang allegations can be tried separately.

The Attorney General concedes some of the changes made by Assembly Bill 333 are ameliorative and thus retroactive, but he argues that they do not apply to the special circumstance murder provision because they constitute an unconstitutional amendment of the law. The Attorney General also asserts that reversal of the gang enhancement allegations and of the underlying felonies based on new section 1109 is not required because any error on these grounds is harmless.

I

*Gang Enhancement and Special Circumstance Murder Statutes*

Section 186.22 was enacted in 1988 as part of the "California Street Terrorism Enforcement and Prevention Act" (STEP Act). (Assem. Bill No. 2013 (1987–1988 Reg. Sess.) Cal. Legis. Serv., ch. 1242; § 186.20 et seq.) The purpose of the STEP Act was to "make the commission of criminal offenses by individuals who are members of street gangs a separate and distinctly punished offense." (*Ibid.*, italics omitted.) Subdivision (a) of section 186.22 makes active participation in a criminal street gang a substantive crime and subdivision (b) sets forth various sentencing enhancements for persons convicted of felonies committed for the benefit of,

16

at the direction of, or in association with a criminal street gang. The statute also defines what constitutes a gang.

Section 190.2 provides the statutory authority for the imposition of the death penalty or a term of life imprisonment without the possibility of parole. Subdivision (a)(22) of section 190.2 allows for these harshest of punishments if "[t]he defendant intentionally killed the victim while [he] was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." This provision was added to section 190.2 in 2000 as part of Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998. "[T]he findings and declarations included in Proposition 21 announced: 'Gang-related crimes pose a unique threat to the public because of gang members' organization and solidarity. Gang-related felonies should result in severe penalties. Life without the possibility of parole or death should be available for murderers who kill as part of any gang-related activity.' (Ballot Pamp., Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 2, subd. (h), p. 119 … (Ballot Pamphlet).)" (*People v. Shabazz* (2006) 38 Cal.4th 55, 65, italics omitted (*Shabazz*).)

Section 186.22, subdivision (f), which was modified by Assembly Bill 333, now defines a "criminal street gang [as] 'an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity.' (§ 186.22, subd. (f).)" (*People v. Lopez* (2022) 82 Cal.App.5th 1, 11 (*Lopez*).) Under subdivision (e)(1), "[a] ' "pattern of criminal gang activity" ' " is defined as

" ' "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of' two or more offenses listed [therein], if such conduct occurred within certain time frames and under particular circumstances specified therein.  (§ 186.22, subd. (e)(1).)  This is commonly known as the 'predicate offenses' requirement.  (*People v. Navarro* (2021) 12 Cal.5th 285, 311.)"  (*Lopez,* at pp. 11–12.)

The enhancements and alternate penalty provisions created by the statute "apply only to gang-related crimes, meaning offenses 'committed for the benefit of, at the direction of, or in association with a criminal street gang.'  (§ 186.22, subds. (b), (d); accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)  The enhancements and alternate penalties further require 'the specific intent to promote, further, or assist in criminal conduct by gang members.'  (§ 186.22, subds. (b)(1), (4), (d).)"  (*Lopez, supra*, 82 Cal.App.5th at p. 12.)

"As of January 1, 2022, predicate offenses must be shown to have '*commonly* benefited' the alleged gang," and "the terms 'benefit,' 'promote,' 'further,' and 'assist' are now defined to mean providing 'a common benefit to members of a gang where *the common benefit is more than reputational.*' ([§ 186.22, subds. (e)(1)], (g).)"  (*Lopez, supra*, 82 Cal.App.5th at p. 12, italics added.)  In addition, the "[c]urrently charged offenses no longer qualify (*id.*, subd. (e)(2)), and at least one predicate offense must have been committed 'within three years of the date the current offense is alleged to have been committed ...' (*id.*, subd. (e)(1))."  (*Ibid.*)

Assembly Bill 333 also added a new statutory provision, section 1109.  This new statutory provision permits bifurcation of gang offenses and allegations.  (Stats. 2021, ch. 699, § 5.)  It provides:

"(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows:

"(1) The question of the defendant's guilt of the underlying offense shall be first determined.

"(2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence.

"(b) If a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22."

II

*Sufficient Evidence Supported the Jury's Finding that*
*Herbert was an Active Participant in a Gang*

Herbert asserts insufficient evidence supported the jury's finding that he was an active participant in a criminal street gang for purposes of the gang special circumstances murder allegation under section 190.2, subdivision (a). The Attorney General responds that ample evidence supported the finding that, despite Herbert's testimony that he was "out bad" with the Mongols, Herbert was an active participant in the gang.

A

In determining the sufficiency of the evidence supporting a factual finding, this court must " 'review the whole record in the light most favorable

19

to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 681.) This court presumes in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

As noted, section 190.2, subdivision (a)(22), mandates a sentence of death or life without the possibility of parole when "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." The gang-murder special circumstance allegation thus contains four elements: (1) the defendant intentionally killed the victim; (2) the defendant was an active participant in a street gang; (3) the defendant knew of the gang's illegal purpose, and (4) the murder was carried out to further the activities of the criminal street gang. (§ 190.2, subd. (a)(22); *People v. Carr* (2010) 190 Cal.App.4th 475, 488 (*Carr*).)

As an initial matter, we note that the active participation element was not modified by Assembly Bill 333. The California Supreme Court has defined "actively participates in a criminal street gang," as used in section 186.22, subdivision (a), to mean "involvement with a criminal street gang that is more than nominal or passive." (*People v. Castenada* (2000) 23 Cal.4th 743, 747.) That definition has been extended to the equivalent phrase "active participant in a criminal street gang" contained in section 190.2, subdivision (a)(22). (See, e.g., *Carr, supra*, 190 Cal.App.4th at p. 489, fn. 14 [citing facts of *Castenada* to support sufficient evidence of active

20

participation in a criminal street gang under section 190.2, subdivision (a)(22)].)

Section 190.2, subdivision (22)'s active participation requirement is established where there is evidence of "involvement with a criminal street gang in a way that is more than passive or in name only." Further, the requirement can be satisfied even where the defendant is not an actual member of a gang, as Herbert testified here. The jury was instructed with a modified version of CALCRIM No. 736, which correctly stated that "The People do not have to prove that the defendant devoted all or a substantial part of his time or efforts to the gang, or that he was an actual member of the gang."[4] (*Carr, supra*, 190 Cal.App.4th at p. 486, quoting CALCRIM No. 736.)

Rather, active gang participation can derive from the defendant's "knowledge that [the gang's] members engage in, or have engaged in, a pattern of criminal gang activity" and the fact that he "willfully promote[d], further[ed], or assist[ed] in felonious criminal conduct by members of that gang." (§ 186.22, subd. (a).) A defendant's active gang participation may be gleaned from the circumstances of the charged crimes (*Castenada, supra*, 23

---

[4] The instruction given to the jury stated, in relevant part: "The defendant is charged with the special circumstance of committing murder while an active participant in a criminal street gang in violation of Penal Code section 190.2, subdivision (a)(22). To prove that this special circumstance is true, the People must prove that: [¶] 1. The defendant intentionally killed James Duty; [¶] 2. At the time of the killing, the defendant was an active participant in a criminal street gang; [¶] 3. The defendant knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; [¶] AND [¶] 4. The murder was carried out to further the activities of the criminal street gang. [¶] Active participation means involvement with a criminal street gang in a way that is more than passive or in name only. [¶] The People do not have to prove that the defendant devoted all or a substantial part of his time or efforts to the gang, or that he was an actual member of the gang."

21

Cal.4th at p. 753), his association with other known gang members (*People v. Salcido* (2007) 149 Cal.App.4th 356, 361 (*Salcido*)), or other indicia such as gang monikers and tattoos (*People v. Galvez* (2011) 195 Cal.App.4th 1253, 1258).

B

Herbert asserts that there was no evidence that he was "an active participant [in the Mongols] at the time of the offense."  This assertion is belied by the record.  When viewed in the light most favorable to the judgment, the evidence supports the jury's finding that Herbert was involved with the Mongols "in a way that [was] more than passive or in name only" at the time of the shooting.  Herbert admitted he was a member of the Mongols for at least three years and he was active in the club as recently as three months before his arrest.  He also admitted to the detectives during his interview that he spoke with other active members of the club *on the night of* the shooting.

Contrary to his claims that he no longer had "connection to the Mongols anymore," cell phone records revealed—and Herbert acknowledged—that he had multiple conversations with at least three men whom he identified as Mongols while he claimed to be "out bad" from the club.  At 5 p.m. on the night of the shooting, Herbert spoke with Mongol member M.G., who lived

two blocks from the shooting site and was at home at the time. He also admitted he knew M.G. and that he had been to his house.[5]

In addition, the circumstances of the crime supported the finding that Herbert was an active participant in the gang. For instance, the evidence suggested Herbert fired his revolver at least four times at a group of unarmed Hells Angels, the Mongols' main rival. There was no evidence that suggested he knew or had any prior interaction with any of the victims, or that the shooting was otherwise provoked. Rather, the victims' appearance, shown to the jury in photographs of their attire, motorcycles, and tattoos, revealed that they were members of the Hells Angels. The act of shooting at these men, in conjunction with Guerry's expert testimony that there was a "standing order amongst all Mongols that they're to shoot on sight any Hells Angels" they see, supported the finding of active gang participation by Herbert.

Further, the prosecution presented evidence that Herbert had never left the Mongols. He had numerous Mongol clothing items and other paraphernalia at his house. He had multiple Mongol tattoos on his neck, head, and body, which Guerry testified made him a target for assault by Mongols if he had actually been ejected from the club. Herbert acknowledged he had not taken any steps to remove the tattoos, and had not encountered

---

5     *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1509, cited by Herbert, held that sufficient evidence supported the jury's active participation finding where the defendant, like Herbert, disclaimed he was an active participant of a criminal gang at the time of his arrest for carrying a loaded unregistered firearm in public and street terrorism. To support the finding, the court pointed to evidence showing the defendant had inside knowledge of the gang's activities that was current, contradicting his testimony that he had left the gang several years before. (*Id.* at pp. 1509–1510.) Here, Herbert was in direct communication with other active gang members both just before and right after the shooting. This was far stronger evidence of his current active participation in the criminal gang than the evidence found sufficient in *Garcia*.

any problems with other Mongols, rather he was celebrated in jail for killing a Hells Angel.  Herbert repeatedly stated that he was hesitant to testify or answer questions because of the gang's code of retaliating against those who "snitch," also implying his continued affiliation with the Mongols.

The only evidence of Herbert being kicked out of the Mongols was his own self-serving statements.  While Guerry testified that the Mongols' repossession of a member's motorcycle is a sign of ejection, and Herbert's motorcycle was never found after the shooting, Herbert stated that he "left it" at a repair shop because he "couldn't afford it."  He also said the club "basically said that they were keeping it," but he could not recall the name of the shop where he dropped it off for service.

In sum, more than sufficient evidence supported the finding that Herbert was an active participant in the Mongols at the time of these crimes.  The jury was free to reject Herbert's claimed disassociation with the gang as an attempt to evade liability for the gang charges, and it is not this court's role to reevaluate the evidence or Herbert's credibility.  (See e.g. *Salcido, supra*, 149 Cal.App.4th at pp. 361–362 [It is "common for gang members to claim … that they used to be gang members when they are arrested for what may be seen as a gang-related crime.  Doing so allows them to state their allegiance to the gang and simultaneously deny active participation so the crime will not be charged as a gang-related crime."].)

III

*Sufficient Evidence Supported the Jury's Finding that Herbert Committed Murder to Further the Gang's Activities*

Herbert next argues that insufficient evidence supported the jury's finding that the crimes were committed with intent to further the gang's activities because the evidence showed Herbert's only purpose was returning to the Mongols' good graces.  The Attorney General responds that this

24

purpose was squarely aligned with furthering the gang's activities, and that the evidence supported the finding that the shooting benefited the Mongols by furthering the gang's territorial control by intimidating and killing a member of the Mongols' primary rival.

A

Another element of the gang-murder special circumstance allegation is "that the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22); *Carr, supra*, 190 Cal.App.4th at p. 488.) "In common usage, … 'further' means to help the progress of." (*People v. Ngoun* (2001) 88 Cal.App.4th 432, 436.) Because the language of section 190.2, subdivision (a)(22), substantially parallels the language of section 186.22, subdivision (b)(1), courts look to cases discussing the sufficiency of the evidence to establish the intent to benefit a criminal street gang under that provision to inform their analysis. (See *Carr, supra*, 190 Cal.App.4th at pp. 488–489.)

Indicia of intent to further the activities of a criminal street gang include: (1) actions directed at rival gang members (*People v. Romero* (*Romero*) (2006) 140 Cal.App.4th 15, 18–19); (2) the suspicion by the perpetrator that the victims are rival gang members (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1190 (*Zepeda*)); (3) the wearing of gang clothing; (4) a concern with protecting gang territory from intruders; and (5) whether the actions were typical gang-related activity (*People v. Gardeley* (1996) 14 Cal.4th 605, 619 (*Gardeley*)). An expert's response to hypothetical questions also constitutes circumstantial evidence—and thus substantial evidence—if based on evidence presented at trial. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*).)

B

25

Herbert's assertion that the evidence showed only that he was attempting to "further [his] goal of being let back into the Mongols" is not well-taken. The shooting of multiple members of the primary rival gang is an obvious indicator of intent to further the activities of a gang. (See *Romero, supra*, 140 Cal.App.4th at pp. 18–19.) As noted, the victims were unarmed, and no evidence suggested the shooting was provoked or that it was motivated by anything other than gang affiliation. The fact that the motorcyclists were traveling as a group while wearing Hells Angels insignia further supports the jury's finding that the shooting was intended to further the activities of the Mongols. (See *Gardeley, supra*, 14 Cal.4th at p. 619; *Zepeda, supra*, 87 Cal.App.4th at p. 1190.)

Herbert argues there was insufficient evidence to establish the crimes were gang-related because no one "at the scene of the offense saw [his] tattoos" and he did not announce his intention to benefit the gang or claim credit. This argument disregards the evidence that the victims were Hells Angels and of Herbert's conduct after the shootings. The bikers had open and obvious "Hells Angels" patches on their vests and their motorcycles bore distinctive Hells Angels insignia and were decorated with red, the color associated with the Hells Angels. Thus, the evidence supported the inference that Herbert targeted the victims because it was clear they were affiliated with the Hells Angels.

Likewise, the trial evidence amply supported the inference that Herbert intended to benefit the Mongols. In fact, Herbert confessed to—and boasted about—committing the crime. Specifically, he admitted he was the shooter to M.S. He also seemed to brag about his actions to her mother, S.L. Herbert also took pride in news coverage when talking to another Mongol and

26

admitted the shootings made him a jailhouse celebrity, a role he did not disclaim.

Further, Guerry's response to hypothetical questions mirroring the prosecution's evidence constituted substantial evidence that the crime was committed for the benefit of the Mongols. (See *Vang, supra*, 52 Cal.4th at p. 1048 [" 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement."].) Guerry opined that such a shooting was gang-related in his opinion given the "long ongoing 50-year feud [with the] Hells Angels, the paraphernalia that was found at [the shooter's] residence, the tattoos on that person, the fact that the person refused to identify any other possible coconspirators, and the fact that it was … a … long-standing rival gang."

Finally, as the Attorney General points out, Herbert's argument is contradicted by the gang enhancement statute. Even after Assembly Bill 333 has limited the scope of a section 186.22 gang enhancement, the law states explicitly that furthering of gang activities includes "targeting a perceived or actual gang rival." (§ 186.22, subd. (g).) The fact that Herbert may also have used the crime to his own "benefit" in an attempt to rejoin his gang, does not negate the fact that it was for that gang's benefit. Those two purposes are united. Even if Herbert was expelled from the gang for sleeping with another member's ex-wife, the crime benefitted both Herbert individually and the gang he sought to reconcile with. Said another way, Herbert's acts would not have helped him to return to the gang if murdering a Hells Angel did not simultaneously further the gang's interests.

IV

*Assembly Bill 333 Requires Reversal of the True Findings on the Gang Enhancement and Special Circumstances Murder Allegations*

A

*Assembly Bill 333*

As noted, Assembly Bill 333 amended California's gang statutes in four ways. First, the legislation amended the definition of "pattern of criminal gang activity," i.e. the predicate offense requirement, contained in section 186.22, subdivision (e) by requiring that: (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently-charged offense is alleged to have been committed; (2) the offenses are committed on separate occasions or by two or more gang members, as opposed to persons; (3) the offenses commonly benefited a criminal street gang, and the common benefit was more than reputational; and (4) the currently-charged offense cannot be used to establish a pattern of gang activity (Stats. 2021, ch. 699, § 3). The bill also reduced the list of qualifying offenses that can be used to establish a pattern of gang activity from thirty-three to twenty-six, removing looting, felony vandalism, and several fraud offenses. (*Ibid.*)

Second, Assembly Bill 333 amended the definition of "criminal street gang" contained in section 186.22, subdivision (f) by narrowing it to "an ongoing, organized association or group of three or more persons." In addition, the statute now requires prosecutors to show that members of the gang "collectively" engage in, or have engaged in, a pattern of gang activity. Individual engagement is no longer sufficient. (Stats. 2021, ch. 699, § 3.)

The third significant change made by Assembly Bill 333, discussed in Section III, was the creation of a new definition of "to benefit, promote, further, or assist," set forth in new section 186.22, subdivision (g). This new

28

provision now defines the phrase as "to provide a common benefit to members of a gang where the common benefit is more than reputational." (Stats. 2021, ch. 699, § 3.) The provision also states "[e]xamples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (*Ibid.*)

Lastly, Assembly Bill 333 created section 1109. As discussed, this new statutory provision permits a gang participation charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. (Stats. 2021, ch. 699, § 5.) It also permits defendants to request that a gang enhancement be tried separately from the underlying offense. In such a case, the truth of the gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense. (*Ibid.*)

B

*The Amendments to Section 186.22*
*Apply Retroactively to Herbert*

The Attorney General concedes the amendments to section 186.22 apply retroactively to judgments not yet final on appeal, and that "a majority of the amendments enacted via [Assembly Bill] 333 are retroactively applicable to" Herbert. He argues, however, that there are two exceptions to retroactivity: (1) section 1109, which is prospective in nature, and (2) the changes to section 186.22, subdivision (f) to the extent those changes are incorporated into section 190.2, subdivision (a)(22).

Under the rule of retroactivity announced in *In re Estrada* (1965) 63 Cal.2d 740, 742–745, we presume, absent evidence to the contrary, that statutes that reduce punishment for criminal conduct apply retroactively to

all defendants whose sentences are not final on the statute's operative date. (See *People v. Frahs* (2020) 9 Cal.5th 618, 624; *People v. Brown* (2012) 54 Cal.4th 314, 323.) As the California Supreme Court recently held, by increasing the threshold requirements of a conviction on the active gang participation offense and the gang enhancement allegation pursuant to section 186.22, subdivisions (a) and (b)(1), respectively, Assembly Bill 333 is ameliorative on some sentences, and is therefore retroactive under the *Estrada* rule. (*People v. Tran* (2022) 13 Cal.5th 1169, 1238 (*Tran*); accord *People v. Lopez* (2021) 73 Cal.App.5th 327, 344 [concluding the amendments to section 186.22 implemented by Assembly Bill 333 are retroactive because they "increase[ ] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement"]; *People v. Lee* (2022) 81 Cal.App.5th 232, 237, review granted Oct. 19, 2022, S275449 (*Lee*) [following *People v. Lopez, supra,* 73 Cal.App.5th 327]; *People v. Montano* (2022) 80 Cal.App.5th 82, 89 [same]; *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822–823 [same]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1126–1127 (*Ramos*) [same].)

C

*Assembly Bill 333's Modification of Section 186.22*
*Does Not Unconstitutionally Amend Section 190.2*

As noted, subdivision (a)(22) of section 190.2 was added to the Penal Code in 2000 by Proposition 21, the Gang Violence and Juvenile Crime Prevention Act. The provision expressly incorporates the statutory definition of what constitutes a "criminal street gang" contained in section 186.22, subdivision (f). The California Constitution, specifically subdivision (c) of article II, restricts the Legislature from amending "an initiative statute by another statute" unless the subsequent statute is "approved by the electors" or "the initiative statute permits amendment … without the electors' approval." (Cal. Const., art. II, § 10, subd. (c).) The parties do not dispute

30

that Assembly Bill 333 did not meet this criteria. Thus, the Attorney General asserts, Assembly Bill 333's amendments to section 186.22 are an unconstitutional amendment to a voter initiative if they are applied to section 190.2, subdivision (a)(22).

On this question, two courts have recently reached different conclusions, and the issue is now pending before the California Supreme Court. In *People v. Rojas* (2022) 80 Cal.App.5th 542, review granted October 19, 2022, S275835, a divided panel in the Fifth Appellate District agreed with the Attorney General and held, "allowing Assembly Bill 333's changes to section 186.22 to affect section 190.2, subdivision (a)(22) would constitute an impermissible amendment of Proposition 21." (*Id.* at p. 547 (maj. opn. of Poochigian, J.); but see *id.* at pp. 558–561 (conc. & dis. opn. of Snauffer, J.).) By contrast, the Second Appellate District in *Lee* held Assembly Bill 333 did not unconstitutionally amend section 190.2, subdivision (a)(22). (*Lee, supra*, 81 Cal.App.5th at p. 245.) We agree with *Lee* and conclude the amendments to section 186.22 do not constitute an unconstitutional amendment of Proposition 21.

"In deciding whether [a] particular [statutory] provision amends [a voter initiative], we simply need to ask whether it prohibits what the initiative authorizes, or authorizes what the initiative prohibits." (*People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 571 (*Pearson*).) What the voters intended to authorize or prohibit by the initiative "is a question of statutory interpretation. When we interpret an initiative, we apply the same principles governing statutory construction. We first consider the initiative's language, giving the words their ordinary meaning and construing this language in the context of the statute and initiative as a whole. If the language is not ambiguous, we presume the voters intended the meaning

31

apparent from that language, and we may not add to the statute or rewrite it to conform to some assumed intent not apparent from that language. If the language is ambiguous, courts may consider ballot summaries and arguments in determining the voters' intent and understanding of a ballot measure." (*Ibid.*) In short, "[t]he voters should get what they enacted, not more and not less." (*Ibid.*)

The California Supreme Court has "had occasion in past decisions to review at length the findings and declarations that were set forth as part of [Proposition 21]." (*Shabazz, supra*, 38 Cal.4th at p. 65.) As the court has explained, "[t]he voters intended to address gang-related crime generally," and, as relevant here, " 'to punish all gang crime more severely.' " (*Ibid.*, quoting *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 905–908 (*Robert L.*).) The ballot measure announced: " 'Gang-related crimes pose a unique threat to the public because of gang members' organization and solidarity. Gang-related felonies should result in severe penalties.' " (*Shabazz*, at p. 65, quoting Ballot Pamp., Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 2, subd. (h), p. 119 (Ballot Pamphlet).) To this end, the measure further stated, "[l]ife without the possibility of parole or death should be available to murderers who kill as part of any gang-related activity." (Ballot Pamphlet, text of Prop. 21, p. 119.)

In the arguments in favor of Proposition 21, the ballot pamphlet explained: "Proposition 21 doesn't incarcerate kids for minor offenses—it protects Californians from violent criminals who have no respect for human life. [¶] Ask yourself, if a violent gang member believes the worst punishment he might receive for a gang-ordered murder is incarceration at the California Youth Authority until age 25, will that stop him from taking a life? Of course not, and THAT'S WHY CALIFORNIA POLICE OFFICERS

AND PROSECUTORS OVERWHELMINGLY ENDORSE PROPOSITION 21. [¶] Proposition 21 ends the 'slap on the wrist' of current law by imposing real consequences for GANG MEMBERS, RAPISTS AND MURDERERS who cannot be reached through prevention or education." (Ballot Pamphlet, *supra*, argument in favor of Prop. 21, p. 48.) In the arguments against Proposition 21, opponents noted California already had tough laws against gangs and "tools ... to prosecute and punish gang members who commit violent crimes." (*Id.*, argument against Prop. 21, p. 49.) Notably, the voters changed only the *punishments* for gang-related offenses and enhancements.

As we shall explain, the amendments to section 186.22 implemented by Assembly Bill 333 are not in conflict with the voters' intent, as articulated in the ballot materials, in enacting Proposition 21. In enacting Assembly Bill 333, the Legislature explained that proponents of the STEP Act "claimed the prosecution would be unable to prove an offense was committed for the benefit of, or in association with, a gang 'except in the most egregious cases where a pattern of criminal gang activity was clearly shown.' " (Stats 2021, ch. 699, § 2, subd. (g).) The Legislature found, however, that the STEP Act was "continuously expanded through legislative amendments and court rulings," leading to its "ubiquitous" application. (*Ibid.*)

The Legislature further stated that "[c]urrent gang enhancement statutes criminalize entire neighborhoods historically impacted by poverty, racial inequality, and mass incarceration as they punish people based on their cultural identity, who they know, and where they live," in part because "[t]he social networks of residents in neighborhoods targeted for gang suppression are often mischaracterized as gangs." (Stats 2021, ch. 699, § 2, subds. (a), (d)(8); see also *id.* at subd. (d)(7) ["People frequently receive gang enhancements based on the conduct of other people whom they have never

33

even met."].)  Assembly Bill 333's amendments to section 186.22 aim to reverse that course.

The amendments, however, do not change the length of the sentences imposed, nor do they remove gang-related murder from the list of special circumstances making a qualifying defendant eligible for death or life without the possibility of parole.  Rather, they are aimed at ensuring the existing punishments set forth in sections 186.22 and 190.2, subdivision (a)(22) are applied only to the type of crime that is related to criminal street gangs and gang activity.  In the phrasing of this constitutional issue, Assembly Bill 333 does not prohibit what Proposition 21 authorized (longer sentences for gang-related crimes), or authorize what Proposition 21 prohibited.  (See *Pearson, supra*, 48 Cal.4th at p. 571.)  Thus, Assembly Bill 333 does not unconstitutionally amend Proposition 21.  (*Ibid.*)

The Attorney General concedes Assembly Bill 333 did not directly change the language of section 190.2, subdivision (a)(22).  Rather, he argues that " '[W]here a statute adopts by specific reference the provisions of another statute … such provisions are incorporated in the form in which they exist at the time of the reference and not as subsequently modified.' "  (*Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 58–59 (*Palermo*); see also *In re Oluwa* (1989) 207 Cal.App.3d 439, 445 [applying *Palermo* in the context of a statutory amendment to a voter initiative].)  Based on this rule, known as the *Palermo* rule, the Attorney General asserts that by incorporating the definition of "criminal street gang" from section 186.22, subdivision (f) into section 190.2, subdivision (a)(22), the voters intended to adopt the definition solely as it existed when Proposition 21 passed in 2000.

However, this rule of statutory construction is not applied mechanically, rigidly, or in isolation.  (See *In re Jovan B.* (1993) 6 Cal.4th

34

801, 816, fn. 10 ["Several modern decisions have applied the *Palermo* rule, but none have done so without regard to other indicia of legislative intent."]; *Lee, supra*, 81 Cal.App.5th at p. 241 [*Palermo* rule is not mechanically applied]; *People v. Pecci* (1999) 72 Cal.App.4th 1500, 1505 ["the *Palermo* rule is not to be applied in a vacuum"]; see also *People v. Cornett* (2012) 53 Cal.4th 1261, 1271 [" ' "[A] rule of construction ... is not a straitjacket." ' "]; *Woodbury v. Brown-Dempsey* (2003) 108 Cal.App.4th 421, 432 ["Rules of statutory construction are not to be rigidly applied in isolation."].)  In *Palermo* itself, the court set forth an equally significant rule:  " '[W]here the reference is general instead of specific, such as a reference to a system or body of laws or to the general law relating to the subject in hand, the referring statute takes the law or laws referred to not only in their contemporary form, but also as they may be changed from time to time.' "  (*Palermo, supra*, 32 Cal.2d at p. 59.)  As the California Supreme Court has explained since, "when the statutory words themselves 'do not make clear whether [the statute] contemplates only a time-specific incorporation, "the determining factor will be ... legislative intent." ' "  (*People v. Anderson* (2002) 28 Cal.4th 767, 779; see also *Jovan B.*, at p. 816 [same].)

The words of section 190.2, subdivision (a)(22) do not state that the voters intended a time-specific incorporation.  *Doe v. Saenz* (2006) 140 Cal.App.4th 960 provides helpful analysis.  There, the court of appeal considered the impact of the *Palermo* rule on a statute specifying a criminal records exemption could not be granted for persons convicted of certain designated crimes, including any " 'conviction of [a] crime against an individual specified in subdivision (c) of section 667.5 of the Penal Code.' "  (*Saenz*, at p. 982, italics omitted.)  *Saenz* explained the statutory language at issue in *Palermo* authorized certain leases with Japanese nationals made in

35

accordance with " 'any treaty *now existing'* between the United States and Japan." (*Saenz*, at p. 981, italics added.)  By using the words " 'now existing,' " "the incorporating statute referred to the treaty as it existed when the incorporating statute was passed." (*Ibid*.)  Like here, the statute at issue in *Saenz* expressly incorporated a subdivision of a specific statute, but the statutory language did not state the incorporation was time-specific.  (*Saenz*, at p. 981.)  Thus, the court was required to "examine evidence of legislative intent concerning whether the reference is specific or general" and concluded the statutory reference at issue was general, and not time-specific.  (*Ibid*.)

Looking to the indicia of the voters' intent in enacting Proposition 21, we reach the same conclusion reached in *Lee* and hold "the voters did not contemplate a time-specific incorporation of the then-current version of section 186.22, subdivision (f), into the gang-murder special circumstance statute." (*Lee, supra*, 81 Cal.App.5th at p. 241.)  As stated, nothing in Proposition 21 or the Ballot Pamphlet suggests the voters intended to limit the Legislature's ability to amend the statutory definitions set forth in section 186.22, subdivisions (e) or (f).  Indeed, by acknowledging the newly amended definitions apply retroactively to section 186.22 in other contexts, the Attorney General implicitly concedes that Proposition 21 did not preclude the Legislature from making such amendments.  Despite this, the Attorney General argues the voters intended to freeze the same definitions by incorporating section 186.22, subdivision (f) into section 190.2, subdivision (a)(22).  We reject this strained interpretation of the law.

As *Lee* explained, "the electorate clearly knew how to express the intent to freeze a statutory definition." (*Lee, supra*, 81 Cal.App.5th at p. 243.)  In two other situations, Proposition 21 expressly stated references to existing statutes were " 'to those statutes *as they existed on the effective date of this*

36

*act, including amendments made to those statutes by this act.' "* (*Ibid.*; see also Ballot Pamphlet, *supra*, text of Prop. 21, §§ 14, 16, pp. 123–124.) Section 190.2, subdivision (a)(22), however, does not similarly incorporate the definition of criminal street gang as it existed on the effective date of the act. Nor does it include any other time-specific limitation on the incorporation of the statutory definition. "It is not our role to rewrite the initiative by inserting language the drafters never included and the voters never considered." (*People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270, 284 (*Gooden*).)

A more straightforward reading of the ballot materials shows the voters did not intend for the definition of "criminal street gang" set forth in section 186.22, subdivision (f) to remain static across time. The Ballot Pamphlet for Proposition 21 states, "[c]urrent law generally defines 'gangs' as any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of certain crimes." (Ballot Pamphlet, *supra*, analysis of Prop. 21 by Legis. Analyst, p. 46.) It then uses the general term "gang-related" in several places to refer to both the increased sentence enhancements and the gang-murder special circumstance. (Ballot Pamphlet, at pp. 44, 46, 47.) It explains, "[t]his measure increases the extra prison terms for gang-related crimes ... [and] adds gang-related murder to the list of 'special circumstances' that make offenders eligible for the death penalty." (*Id.* at p. 46.) It also contains a summary chart of the gang provisions, and states the act "[i]ncreases penalties for gang-related crimes," without distinguishing between the felony sentencing enhancements and the newly added gang-murder special circumstance. (*Id.* at p. 47.)

37

In addition, the proposed text of Proposition 21 states: "Gang-related felonies should result in severe penalties. Life without the possibility of parole or death should be available for murderers who kill as part of any gang-related activity." (Ballot Pamphlet, *supra*, text of Prop. 21, p. 119.) It also explicitly states the intent of the amendment to section 190.2 was "to add intentional gang-related murders to the list of special circumstances." (Ballot Pamphlet, at p. 131, italics added.) The ballot materials do not differentiate between the meaning of "gang-related" as it is used to modify murder or any other felony, to which a section 186.22 enhancement may apply. An obvious inference from the incorporation of the statutory definition in section 186.22, subdivision (f) into section 190.2, subdivision (a)(22) is that the voters intended for "gang-related" to have the same meaning in both statutes. We agree with *Lee*, that "the term 'criminal street gang' as incorporated in the gang-murder special circumstance statute was 'intended to conform at all times' and 'remain permanently parallel' to section 186.22." (See *Lee, supra*, 81 Cal.App.5th at p. 245.)

Our conclusion also finds support in another well-settled rule of statutory construction, which requires us to construe Proposition 21 " ' "to promote its purpose, render it reasonable, and avoid absurd consequences." ' " (*People v. Taylor* (2021) 60 Cal.App.5th 115.) In enacting Proposition 21, "[t]he voters intended to address gang-related crime generally," and " 'to punish all gang crime more severely.' " (*Shabazz, supra*, 38 Cal.4th at p. 65, quoting *Robert L., supra*, 30 Cal.4th at pp. 905–908.) Construing section 190.2, subdivision (a)(22) to incorporate the statutory definition in section 186.22, subdivision (f) as it was in 2000, while simultaneously allowing the Legislature to amend that same definition in the context of the penalties for gang-related felonies set forth in section 186.22, would lead to

38

absurd, and unjust, consequences. In a case such as this, where a defendant stands accused of a gang-related murder, the defendant "could be found not to qualify for the lesser gang sentence enhancements, but nonetheless found to qualify for capital punishment." (*Lee, supra*, 81 Cal.App.5th at p. 242, fn. 36.) We decline to adopt this result.

Here, the intent of the voters in passing Proposition 21 was to increase penalties for gang-related felonies and murders. "[I]n Assembly Bill 333, the Legislature redefined the term 'criminal street gang' so as to truly target the population of criminals for which an enhanced punishment is warranted." (*Lee, supra*, 81 Cal.App.5th at p. 245.) The Legislature sought to focus the increased penalties of Proposition 21 on crimes that are truly related to patterns of criminal gang activity—the type of crimes that animated voters to enact Proposition 21. Construing section 190.2, subdivision (a)(22) in a manner that allows the incorporated statutory definition of criminal gang activity to evolve concurrently with section 186.22 achieves the goals of both the voters and the Legislature. We therefore conclude Assembly Bill 333 does not unconstitutionally amend section 190.2, subdivision (a)(22).[6]

---

[6] In his briefing, the Attorney General acknowledges this court reached a similar conclusion in *Gooden*, but asserts that *Gooden* is distinguishable. In that case, we concluded the statutory amendments implemented by Senate Bill No. 1437 (2017–2018 Reg. Sess.)—which "prospectively amended the mens rea requirements for the offense of murder and restricted the circumstances under which a person can be liable for murder under the felony-murder rule or the natural and probable consequences doctrine"—did not unconstitutionally amend Propositions 7 or 115—which "increased the punishments for murder and augmented the list of predicate offenses for first degree felony-murder liability, respectively." (*Gooden, supra*, 42 Cal.App.5th at pp. 274, 288–289.) The Attorney General argues two differences between this case and *Gooden* require a different result.

D

*Reversal of the Gang Enhancement and*
*Special Circumstance Allegations is Required*

The Attorney General asserts that even if the new requirements of Assembly Bill 333 apply here, reversal is not warranted because the evidence presented at trial met those requirements.  Thus, any deficiency in the jury instructions based on Assembly Bill 333 was harmless beyond a reasonable doubt.  We disagree.

"When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*Tran, supra*, 13 Cal.5th at pp. 1238–1239.)  "[T]he question [*Chapman v. California* (1967) 386 U.S. 18 (*Chapman*)] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand.  …  The inquiry, in other words, is not whether, in a trial that

___

First, he asserts Senate Bill No. 1437 amended sections 188 and 189 and did not specifically incorporate those provisions by reference.  As we have already explained, the incorporation by reference is not, on its own, sufficient to implicate the *Palermo* rule.

Second, the Attorney General asserts Proposition 21 did not just change the penalty for gang-related crimes, and instead "*created* the special circumstance provision where none had previously existed."  Proposition 21, however, did not create special-circumstance murder, rather it "add[ed] gang-related murder to the list of 'special circumstances' that make offenders eligible for the death penalty" (Ballot Pamphlet, *supra*, analysis of Prop. 21 by Legis. Analyst, p. 46) in order to increase the penalties for gang-related crimes.  This intent is not undermined by ensuring the increased penalties are imposed on persons that commit a true gang-related murder.  (See *Gooden, supra*, 42 Cal.App.5th at p. 288.)

occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.  That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee." (*People v. Lewis* (2006) 139 Cal.App.4th 874, 886–887.)

Here, the prosecution was not required to prove the additional elements of the gang enhancement and special circumstance allegations implemented by the statutory amendments of Assembly Bill 333.  The trial court instructed the jury pursuant to the former requirements of section 186.22, subdivision (b)(1), telling them they could consider the current charged offense as a qualifying predicate act in determining whether the prosecution proved a "pattern of criminal gang activity."  Further, the jury was not told the predicate offenses had to benefit the gang in a way that was more than reputational, that the predicate offenses had to be committed by two or more gang "members" (as opposed to two or more persons), or that the gang members had to collectively engage in the predicate crimes, rather than individually.  (§ 186.22, subds. (e)(1), (g).)  Indeed, the jury was instructed that "[t]he crimes, if any, that establish a pattern of criminal gang activity *need not be gang related*." (Italics added.)

As in *Tran*, the jury thus did not consider whether the predicate offenses were "collectively engaged in" by the Mongols because this was not a requirement at the time of the trial.  Likewise, while Guerry provided some testimony that could support a finding that the predicate offenses benefitted the gang in a manner that was more than reputational, the jury was not asked to make such a finding.  Critically, the record is devoid of any evidence showing how the predicate offenses benefitted the gang in a way that was

41

more than reputational, that the predicate offenses had to be committed by two or more gang "members" (as opposed to two or more persons), or that the gang members had to collectively, rather than individually, engage in the predicate crimes.[7] Given these now-deficient instructions and the lack of evidence to support findings under the modified law with respect to the predicate offense requirement, we cannot say with the requisite certainty that the jury would have reached the same verdict on the gang enhancement and special circumstance findings if they had been instructed under the modified law.[8]

Consequently, the jury's true findings on the gang enhancements pursuant to section 186.22, subdivision (b)(1)(C) must be reversed. (*Tran, supra*, 13 Cal.5th at p. 1207 [holding "reversal of the gang enhancement is required" where "the jury was not presented with any discernible theory as to how [gang] members 'collectively engage[d] in' these predicate crimes" as

---

[7]  Because the jury was not asked to determine if the new requirements of gang laws were satisfied, and reversal on this basis is warranted, we do not reach the Attorney General's argument addressing whether a predicate offense committed by just one member of the gang is sufficient under new section 186.22, subdivision (e)(1).

[8]  We also note that the third predicate offense to which Guerry testified, the crime of carrying a loaded firearm that was committed by Rios, was not contained in the list of offenses the jury was instructed could be considered as qualifying predicates under section 186.22, subdivision (e). Rather, the jury was instructed that "a criminal street gang is [one,] any organization, association, or group of three or more persons whether formal or informal that has a common name or common identifying sign or symbol; two, that has as one or more of its primary activities the commission of *carjacking, robbery, assault or murder*; and three whose members whether acting alone or together engage in or have engaged in a pattern of criminal gang activity." (Italics added.) For this reason, the offense did not adequately serve as a qualifying predicate.

required by amended section 186.22, subdivision (f)]; *People v. Lopez, supra*, 73 Cal.App.5th at p. 346 [concluding a gang-related enhancement finding prior to Assembly Bill 333 must be vacated because the People were not required to prove the predicate offenses commonly benefitted a criminal street gang or that the benefit was more than reputational].)

With respect to the gang-murder special circumstance, the trial court instructed the jury under section 190.2, subdivision (a)(22) consistent with its instruction on the gang enhancement under section 186.22, subdivision (b)(1)(C). As with the enhancement instruction, the court's instruction on the gang-murder special circumstance did not incorporate the additional threshold requirements for a true finding that are now required under Assembly Bill 333 to establish the Mongols were a criminal street gang as defined by section 186.22, subdivision (f). Consequently, we also vacate the special circumstance murder finding under section 190.2, subdivision (a)(22).

On remand, the People are afforded the opportunity to retry Herbert on the gang enhancement allegations pursuant to section 186.22, subdivision (b)(1)(C), as amended by Assembly Bill 333, and on the special circumstance murder allegation under section 190.2, subdivision (a)(22), incorporating the statutory definitions in section 186.22, as amended by Assembly Bill 333. (See *People v. Lopez, supra*, 73 Cal.App.5th at p. 346; see also *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element[s] upon remand. [Citation.] Such a retrial is not barred by the double jeopardy clause or ex post facto principles because the [additional elements were] not relevant to the charges at the time of trial and accordingly, [the issue] was

never tried."]; *Lee, supra*, 81 Cal.App.5th at p. 245 [vacating the gang-murder special circumstance finding under section 190.2, subd. (a)(22) and remanding to afford the People the opportunity to retry the allegation].)

V

*Even If Section 1109 Is Retroactive, Reversal*
*On this Ground Is Not Warranted Because Any Error Was Harmless*

After Herbert filed his opening brief, two Courts of Appeal held that section 1109 applies retroactively, *People v. Burgos* (2022) 77 Cal.App.5th 550, 568, review granted July 13, 2022, S274743 and *Ramos, supra*, 77 Cal.App.5th at page 1131. As a result, Herbert sought permission to file a supplemental brief addressing this issue, which we granted. Herbert argues that new section 1109 is an ameliorative change to the law and thus must be applied to all cases that were not yet final when the statute became effective. Further, he contends that failure to bifurcate the trial pursuant to the new law is a structural error that requires automatic reversal.

The Attorney General responds that section 1109 is prospective only "because it is a procedural statute that does not reduce the punishment imposed or otherwise alter the substantive requirements of the gang enhancement." Further, he asserts that even if the statute is applied retroactively, any related error is not structural, and reversal is not warranted because in this case not bifurcating the gang evidence would be harmless.

We agree with the Attorney General that any error related to bifurcation was not prejudicial. As the parties acknowledge and the California Supreme Court recently noted, "[t]he question of whether section 1109 applies retroactively is the subject of a split of authority among the Courts of Appeal. (See e.g., *People v. Burgos* (2022) 77 Cal.App.5th 550, 566–567; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1131; *People v.*

44

*Ramirez* (2022) 79 Cal.App.5th 48, 65.)" (*Tran, supra*, 13 Cal.5th 1208.)  As in *Tran*, however, we need not reach this unsettled issue.

*Tran* rejected the argument that the failure to bifurcate in accordance with new section 1109 is a structural error requiring automatic reversal.  The court explained "[e]rrors may be deemed structural according to ' "three broad rationales" ':  [(1)] where ' "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest," ' [(2)] ' "where the effects of the error are simply too hard to measure," ' or [(3)] where ' "the error always results in fundamental unfairness." ' " (*Tran, supra*, 13 Cal.5th at p. 1208.)

*Tran* held "[n]one of these reasons apply [to section 1109].  First, the stated purpose of section 1109 is to reduce the prejudicial impact of gang evidence and to protect defendants from erroneous conviction.  (Stats. 2021, ch. 699, § 2, subd. (d)(6) [section 1109 is designed to prevent the 'further perpetuat[ion]' of 'unfair prejudice in juries and convictions of innocent people'].)  Second, errors relating to wrongful admission of evidence are traditionally subject to harmless error review [citation], demonstrating that the effects of these types of errors are not 'simply too hard to measure' [citation].  Finally, although the admission of gang evidence may sometimes result in fundamental unfairness (see, e.g., *People v. Albarran* (2007) 149 Cal.App.4th 214, 232), this is not always the case.  We have held that gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime.  [Citation.]  Additionally, the fact that section 1109 requires bifurcation only upon a defendant's request suggests there are circumstances where a single trial remains appropriate." (*Tran, supra*, 13 Cal.5th at p. 1208.)

*Tran* also rejected the defendant's assertion in that case that the failure to bifurcate in accordance with section 1109 is reviewed under the more rigorous *Chapman* standard. The court held " '[t]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair.*' " (*People v. Partida* (2005) 37 Cal.4th 428, 439.) As in *Tran*, such prejudice did not occur in this case. As an initial matter, the predicate offense evidence presented in this case was very limited and not salacious. Guerry testified about three prior gang-related crimes that were far less inflammatory—none of them involved homicide and the jury was not provided detail on the offenses—than the crimes for which Herbert was being tried. As the Attorney General argues, any prejudicial impact of this evidence was minimal.

More importantly, the prosecution's case on the underlying felonies was largely dependent on evidence that was independent of gang evidence that could be excluded in a bifurcated proceeding. (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [failure to bifurcate was harmless under *Watson* because verdict was not based on improper bias but on strong evidence defendant committed the charged offenses]; *Ramos, supra*, 77 Cal.App.5th at p. 1133; [defendant not entitled to reversal of his conviction under *Watson* because he was not harmed by the failure to bifurcate gang enhancement].) Herbert's own testimony, his confession and threats to M.S. and to others, the cell phone locational data, and the video surveillance footage of his car during the shooting overwhelmingly pointed to his guilt.

Further, much of the gang-related evidence would also have been admissible under Evidence Code section 1101 because it was highly relevant to the motive of the shooting. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 ["[E]vidence of the defendant's gang affiliation—including

evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime."].) Even if reputational benefit cannot be used as a basis for a gang enhancement, it would still constitute a strong motive to explain why Herbert shot at the Hells Angels bikers. Thus, even if section 1109 should be applied retroactively, Herbert has not shown any reasonable probability of prejudicial error and the new statute does not provide a basis for reversal in this case.

## DISPOSITION

We vacate the true findings and strike the sentences imposed under sections 186.22, subdivision (b)(1)(C) and 190.2, subdivision (a)(22), and remand the matter to afford the People the opportunity to retry these allegations in conformance with the current law. The judgment is otherwise affirmed.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

DATO, J.

47